1  LATHAM & WATKINS LLP
     Daniel M. Wall (Bar No. 102580)
2      dan.wall@lw.com
     Timothy L. O'Mara (Bar No. 212731)
3      tim.o'mara@lw.com
     Andrew M. Gass (Bar No. 259694)
4      andrew.gass@lw.com
     Kirsten M. Ferguson (Bar No. 252781)
5      kirsten.ferguson@lw.com
   505 Montgomery Street, Suite 2000
6  San Francisco, California  94111-6538
   Telephone:  +1.415.391.0600
7  Facsimile:  +1.415.395.8095

8  Attorneys for Plaintiff
   Ozzy Osbourne
9

10            UNITED STATES DISTRICT COURT

11            CENTRAL DISTRICT OF CALIFORNIA

12                 WESTERN DIVISION

13

14  JOHN MICHAEL "OZZY"              CASE NO.  2:18-cv-02310 DSF (JEMx)
    OSBOURNE, an individual, on his
15  own behalf and for all others similarly   **PLAINTIFF'S OPPOSITION TO**
    situated,                         **DEFENDANTS' MOTION TO**
16                                    **DISMISS THE FIRST AMENDED**
17                  Plaintiff,        **COMPLAINT**

18           v.                       The Honorable Dale S. Fischer

19  ANSCHUTZ ENTERTAINMENT
20  GROUP, INC., a Colorado corporation,   Hearing Date:   July 30, 2018
    AEG PRESENTS LLC, a Delaware        Time:           1:30 p.m.
21  limited liability company, L.A.       Place:          Courtroom 7D
    ARENA COMPANY, LLC, a
22  Delaware limited liability company,
    ANSCO ARENA LTD., a U.K. limited
23  company, and JOHN DOE 1
24  THROUGH 10, whose true names are
    unknown, inclusive,
25
26                  Defendants.
27
28

# TABLE OF CONTENTS

**PAGE**

I.      INTRODUCTION .................................................................................................. 1

II.     FACTUAL BACKGROUND AND PROCEDURAL
        HISTORY ........................................................................................................... 5

        A.    AEG Requires Playing The Staples Center When In Los
              Angeles As A Condition Of Booking The O2 Arena In
              London ..................................................................................................... 5

        B.    Procedural History .................................................................................. 9

III.    ARGUMENT ....................................................................................................... 9

        A.    Ozzy Has Antitrust Standing Because The Staples Center
              Commitment Forecloses Competition To His Detriment ................... 10

              1.    The Staples Center Commitment Regulates Ozzy's
                    Conduct ...................................................................................... 10

              2.    The Restrictions On Ozzy's Conduct Directly
                    Cause Precisely The Harm That Tying Doctrine
                    Forbids ....................................................................................... 12

        B.    The Staples Center Commitment Is Plainly Coercive ....................... 15

              1.    Ozzy Has Alleged Coercive Tying By Express
                    Contract, And It Makes No Difference Whose
                    Signature Is On The Contract .................................................... 16

              2.    AEG's Contention That Ozzy Is Free To Play
                    Other Los Angeles Venues So Long As He Uses
                    Another Promoter Does Not Negate Coercion ......................... 18

              3.    The MTD Would Fail Even If AEG Were Only
                    Requiring Ozzy to Abandon His Chosen Promoter ................. 20

        C.    AEG's Ancillary Arguments Fail ....................................................... 21

              1.    There Is No Market Definition Defect .................................... 21

              2.    Per Se Tying Violations Do Not Require
                    Anticompetitive Effects In The Tied Product
                    Market, But the FAC Alleges Them
                    Comprehensively In Any Event ................................................ 23

IV.     CONCLUSION .................................................................................................. 25

# TABLE OF AUTHORITIES

Page(s)

## CASES

*Aerotec Int'l, Inc. v. Honeywell Int'l, Inc.*,
    836 F.3d 1171 (9th Cir. 2016) ....................................................................... 19, 20

*Am. Ad Mgmt., Inc. v. Gen. Tel. Co. of Cal.*,
    190 F.3d 1051 (9th Cir. 1999) ........................................................... 3, 10, 12, 15

*Amarel v. Connell*,
    102 F.3d 1494 (9th Cir. 1996) ................................................................... 12, 14

*Apple, Inc. v. Psystar Corp.*,
    586 F. Supp. 2d 1190 (N.D. Cal. 2008) ........................................................... 22

*Assoc'd Gen. Contractors of Cal., Inc. v. Cal. State Council of
    Carpenters*,
    459 U.S. 519 (1983) ................................................................................... 12, 14

*Blue Shield of Va. v. McCready*,
    457 U.S. 465 (1982) .......................................................................................... 14

*Brantley v. NBC Universal, Inc.*,
    675 F.3d 1192 (9th Cir. 2012) ..................................................................... 4, 24

*Cascade Health Sols. v. PeaceHealth*,
    515 F.3d 883 (9th Cir. 2008) ................................................................... *passim*

*In re Cathode Ray Tube (CRT) Antitrust Litig.*,
    2016 WL 7805628 (N.D. Cal. Aug. 4, 2016) ................................................... 15

*Comedy Club, Inc. v. Improv W. Assocs.*,
    553 F.3d 1277 (9th Cir. 2009) ......................................................................... 11

*Datagate, Inc. v. Hewlett-Packard Co.*,
    60 F.3d 1421 (9th Cir. 1995) ........................................................................... 20

*Davis v. HSBC Bank Nev., N.A.*,
    691 F.3d 1152 (9th Cir. 2012) ........................................................................... 8

*F.T.C. v. Procter & Gamble Co.*,
    386 U.S. 568 (1967) .......................................................................................... 24

LATHAM&WATKINS LLP
ATTORNEYS AT LAW
SAN FRANCISCO

PL.'S OPP. TO MOT. TO DISMISS FAC

*Illinois Brick v. Illinois*,
    431 U.S. 720 (1977) ........................................................................ 14

*It's My Party v. Live Nation, Inc.*,
    811 F.3d 676 (4th Cir. 2016) ........................................................... 21

*Jefferson Parish Hosp. Dist. No. 2 v. Hyde*,
    466 U.S. 2 (1984) ................................................................... *passim*

*Leegin Creative Leather Prods., Inc. v. PSKS, Inc.*,
    551 U.S. 877 (2007) ........................................................................ 23

*Lucas Auto. Eng'g, Inc. v. Bridgestone/Firestone, Inc.*,
    140 F.3d 1228 (9th Cir. 1998) ...................................................... 3, 14

*Mozart Co. v. Mercedes-Benz of N. Am., Inc.*,
    593 F. Supp. 1506 (N.D. Cal. 1984), *aff'd*, 833 F.2d 1342 (9th Cir.
    1987) ................................................................................... 17, 19

*N. Pac. Ry. Co. v. United States*,
    356 U.S. 1 (1958) ........................................................................... 17

*Paladin Assocs., Inc. v. Montana Power Co.*,
    328 F.3d 1145 (9th Cir. 2003) ..................................................... 17, 19

*In re Qualcomm Antitrust Litig.*,
    292 F. Supp. 3d 948 (N.D. Cal. 2017) .............................................. 17

*Right Field Rooftops, LLC v. Chicago Baseball Holdings, LLC*,
    87 F. Supp. 3d 874 (N.D. Ill. 2015) ................................................. 22

*Sidibe v. Sutter Health*,
    2013 WL 2422752 (N.D. Cal. June 3, 2013) ................................... 3, 14

*Starr v. Baca*,
    652 F.3d 1202 (9th Cir. 2011) ......................................................... 19

*Tanaka v. Univ. S. Cal.*,
    252 F.3d 1059 (9th Cir. 2001) ....................................................... 4, 21

*Theme Promotions, Inc. v. News Am. Mktg. FSI*,
    546 F.3d 991 (9th Cir. 2008) ........................................................... 13

*Tic-X-Press v. Omni Promotions Co.*,
    815 F.2d 1407 (11th Cir. 1987) ............................................... 4, 17, 23

*Times-Picayune Publ'g Co. v. United States*,
   345 U.S. 594 (1953) ...................................................................................... 13

**STATUTES**

15 U.S.C. § 15................................................................................................................. 3

15 U.S.C. § 27................................................................................................... 3, 10, 14

**OTHER AUTHORITIES**

ABA Section of Antitrust Law, ANTITRUST LAW DEVELOPMENTS (8th
   ed. 2017) ............................................................................................................ 3, 16

# I.     INTRODUCTION

This is an antitrust lawsuit by Ozzy Osbourne, the famous musician.  He seeks an injunction to prevent the arena owner AEG from forcing him to play at its Los Angeles venue, the Staples Center, if he wants to play at AEG's London venue, the O2 Arena.  In the parlance of antitrust, AEG has "tied" renting the O2 to renting Staples.  As the U.S. Supreme Court has explained:

> [T]he essential characteristic of an invalid tying arrangement lies in the seller's exploitation of its control over the tying product to force the buyer into the purchase of a tied product that the buyer … might have preferred to purchase elsewhere on different terms. When such "forcing" is present, competition on the merits in the market for the tied item is restrained and the Sherman Act is violated.

*Jefferson Parish Hosp. Dist. No. 2 v. Hyde*, 466 U.S. 2, 12 (1984).  This describes, with alarming precision, *exactly* what AEG is doing to Ozzy.  AEG is exploiting its control over the O2 Arena "to force [Ozzy] into the purchase of a [date at a Los Angeles arena] that [Ozzy] … might have preferred to purchase elsewhere on different terms."

AEG has responded to the operative complaint by filing a motion to dismiss arguing that Ozzy lacks standing to challenge the tying arrangement.  Never mind that Ozzy is the one who will actually play the shows at issue.  Never mind that he, personally, is financially harmed by AEG's anticompetitive conduct.  *See* First Amended Complaint ("FAC") ¶¶ 29, 48, 49.  Ozzy cannot establish "antitrust injury," AEG says, because the paperwork containing the tying obligation—formally called the "Staples Center Commitment"—is executed by Ozzy's *concert promoter,* not *Ozzy himself.*  And, AEG claims, it imposes an obligation on Ozzy to play the Staples Center *only if he uses the same promoter* for the Los Angeles leg of his tour.  Mem. in Supp. of Mot. to Dismiss ("MTD") at 2:3-5.  As a result, AEG argues, its policy "does not 'coerce' or 'force' [Ozzy] to do anything."  *Id*. at 2:27.

1   That argument is baseless on the facts and the law alike.  Factually, AEG

2   misrepresents its own practices with respect to the tying requirement it enforces.

3   The FAC alleges that AEG imposes an obligation *for artists* to play at the Staples

4   Center when they come to Los Angeles, *period. See, e.g.*, FAC ¶ 2 ("AEG requires

5   that artists and musicians cannot play London's most essential large concert venue—

6   the O2 Arena—unless they agree to play the Staples Center[.]").  There is no

7   exception for artists who switch promoters.  AEG claims the "plain language" of the

8   Staples Center Commitment says otherwise, and in essence asks this Court to hold

9   that is what the contract means as a matter of law.  But outside of this Motion, that's

10  not what AEG itself says the contract means.  AEG has publicly stated that it

11  imposed the Staples Center Commitment as an in-kind response to another venue

12  owner's practice of (allegedly) tying Madison Square Garden to The Forum.  AEG

13  has never once suggested that artists are unaffected by the commitment or can avoid

14  it by using a different promoter; rather AEG has admitted that artists *are* constrained

15  by it.  *See* FAC ¶ 36.  Furthermore, although it did not seem necessary to plead this,

16  *the formal venue hire agreement for the O2 referenced in the Staples Center*

17  *Commitment unambiguously requires the promoter to ensure that the artist plays*

18  *Staples when in Los Angeles*.  We have no idea how AEG justifies filing this Motion

19  without bringing that to the Court's attention.

20  AEG's argument is legally unsound anyway, and several times over.  First,

21  Ozzy has standing to seek injunctive relief against the Staples Center Commitment

22  regardless of whether it is conceived, properly, as a venue-to-venue tying

23  arrangement or, as AEG seems to prefer, as a requirement for Ozzy to choose

24  between his preferred Los Angeles venue and his preferred Los Angeles promoter.

25  AEG's interpretation simply describes a different kind of tying arrangement—

26  specifically, a tie between the venue and concert promotion services (which AEG

27  also provides).  But in either case, AEG plainly exploits its control over the O2 Arena

28  to coerce the artist to make choices he would not make in an unrestrained market.

Ozzy is a victim of that anticompetitive "forcing," which as *Jefferson Parish* explains is what makes tying unlawful. *Jefferson Parish,* 466 U.S. at 12. As such, Ozzy is alleging a classic "antitrust injury," meaning one "that flows from that which makes the conduct unlawful, and … is of the type the antitrust laws were intended to prevent." *Am. Ad Mgmt., Inc. v. Gen. Tel. Co. of Cal.*, 190 F.3d 1051, 1055 (9th Cir. 1999).

AEG's standing arguments reflect two fundamental legal errors. First, AEG seems to think that only parties to a tying arrangement have legal standing to challenge it. That is unquestionably wrong. Third parties can—and often do—bring tying cases. *See Cascade Health Sols. v. PeaceHealth*, 515 F.3d 883, 913 (9th Cir. 2008) (referring categorically to "third party" tying cases); *Sidibe v. Sutter Health*, 2013 WL 2422752, at *13 (N.D. Cal. June 3, 2013) (rejecting argument that plaintiffs lack standing to assert a tying claim because they "are not parties to the contract" establishing the tie). So even if Ozzy were not contractually bound by the Staples Center Commitment (which he is), he would still have standing as an affected third party.

Second, AEG relies extensively on cases addressing whether indirect victims of anticompetitive conduct can assert antitrust *damages* claims under Section 4 of the Clayton Act, 15 U.S.C. § 15. But this case seeks only *injunctive* relief and is therefore subject to Section 16 of the Clayton Act, 15 U.S.C. § 27, which allows "[a]ny person, firm, corporation, or association . . . to sue for and have injunctive relief . . . against threatened loss or damage by a violation of the antitrust laws." Importantly, injunctive relief under Section 16 is broadly available to both direct and indirect victims of anticompetitive conduct. *See, e.g., Lucas Auto. Eng'g, Inc. v. Bridgestone/Firestone, Inc.*, 140 F.3d 1228, 1235 (9th Cir. 1998) ("[I]ndirect purchasers are not barred from bringing an antitrust claim for injunctive relief[.]"); ABA Section of Antitrust Law, ANTITRUST LAW DEVELOPMENTS 777 (8th ed. 2017) ("[I]ndirect purchasers who demonstrate 'threatened' injury may maintain antitrust

1    actions for injunctive relief under federal law[.]").  Standing in injunctive relief
2    actions is therefore primarily about whether there is a reasonably proximate
3    connection between the anticompetitive conduct and (a) threatened harm of to the
4    plaintiff that is (b) of the type that antitrust law seeks to prevent.  Ozzy has pled that,
5    and therefore has standing to complain about AEG's anticompetitive tying.

6         AEG rounds out its motion with several ancillary attacks, contending that the
7    FAC fails to allege cognizable harm to competition and a valid market definition.
8    Both suggestions are baseless.  With respect to anticompetitive effects, (a) none are
9    required to state a claim for *per se* illegal tying like AEG's, and (b) regardless, they
10   are described at length in the FAC, which goes into extensive detail regarding the
11   adverse effects on competition among Los Angeles venues.  *See* FAC ¶¶ 46-48, 59.
12   Competition does not need to be completely extinguished for tying to be unlawful
13   under antitrust's "rule of reason."  For pleading purposes, it is sufficient to allege a
14   significant restraint on competition, for example "that the tying arrangement . . .
15   causes consumers to forego the purchase of substitutes for the tied product."
16   *Brantley v. NBC Universal, Inc.*, 675 F.3d 1192, 1201 (9th Cir. 2012).  Ozzy has
17   alleged that and more.

18        With respect to market definition, AEG mischaracterizes the FAC as relying
19   on a legally impermissible "single product" market.  MTD at 17:7.  That's not true
20   at all.  Ozzy defines the relevant markets for concert arenas in London and Los
21   Angeles in relation to the same "reasonable interchangeability of use and cross-
22   elasticity of demand" criteria that AEG proposes.  *Compare id.* at 16:24-26 (*quoting*
23   *Tanaka v. Univ. S. Cal.*, 252 F.3d 1059, 1063 (9th Cir. 2001)), *with* FAC ¶¶ 42-45.
24   It so happens that in London, that approach yields a market with just one arena,
25   because there are no reasonable substitutes for the O2.  In Los Angeles, the *same*
26   *approach* yields a market with multiple arenas, because those are the facts on the
27   ground.  There are no legal flaws with that approach at all—and certainly none that
28   can be addressed under Rule 12(b)(6).  *See Tic-X-Press v. Omni Promotions Co.*,

1   815 F.2d 1407, 1420 (11th Cir. 1987) (rejecting challenge to tying product market
2   defined as indoor arena-sized venues in Atlanta, which happened to contain only one
3   facility).

4        AEG's Motion may have served some non-legal purpose by attacking Ozzy's
5   lawyers and attracting attention in the press, but as a matter of law, it fails on every
6   dimension.   We respectfully request that the Court deny it and allow this suit to
7   proceed.

8   **II.   FACTUAL BACKGROUND AND PROCEDURAL HISTORY**

9        **A.    AEG Requires Playing The Staples Center When In Los Angeles**
10            **As A Condition Of Booking The O2 Arena In London**

11       A major rock star looking to play an indoor arena in London doesn't have
12   much choice for where to stage it.   There is the O2 Arena—and not much else.   The
13   nearest comparably sized indoor concert venue is 160 miles away, in Birmingham,
14   England.   FAC ¶ 41.   As a result of the O2's London location, seating capacity,
15   ability to host major events, and the absence of nearby arenas with similar attributes,
16   the O2's owner, AEG, wields significant market power—likely monopoly power—
17   in the market for arena-sized indoor venues for musical concerts in London or greater
18   London. *Id*. ¶¶ 43, 52.

19       That is unusual.   Most major cities or metropolitan regions have more than
20   one large arena that artists might play when they tour the area.   In Los Angeles, for
21   example, the same rock star applying the same criteria for choosing a venue could
22   play the Staples Center, which AEG also owns; the Forum, which is owned by Azoff
23   MSG Entertainment LLC and recently underwent a $100 million renovation, *id*.
24   ¶ 45; and perhaps others.   So Los Angeles, unlike London, is (or would be, absent
25   the restraints imposed by AEG) a competitive venue market.   That competition
26   redounds directly to the benefit of artists.   *Id*. ¶¶ 29, 46, 48.   Through their
27   representatives—typically concert promoters, agents, managers and the like—artists
28   use the bargaining process to extract concessions from dueling, competitive arenas,

1    which make the artists financially better off than they would be absent that
2    competition. *Id*. ¶¶ 28, 29, 48.

3        John Michael "Ozzy" Osbourne is one of the most recognizable musicians in
4    the world. *Id*. ¶ 7.  In January 2018, his concert promoter, Live Nation (Music) UK
5    Ltd. ("Live Nation"), sought to book the O2 for Ozzy's final world tour, known as
6    "*No More Tours 2*."  *Id*. ¶ 5.  In industry jargon, Live Nation asked to "pencil in"
7    February 11, 2019—which would reserve that date for Ozzy's performance, pending
8    the completion a formal venue-hire agreement.  *Id*. ¶ 30.   The date was, in fact,
9    available. *Id*.

10       But AEG would not simply give it to Ozzy, no-strings-attached.  Instead, it
11   sent a letter to Live Nation with the subject line, "Staples Center Commitment –
12   Ozzy Osbourne at The O2 Arena."  *Id*. ¶ 31.  The letter references a "new booking
13   policy," which it then goes on to describe.  *Id*.  The policy provides that if (a) Ozzy
14   books the O2, and (b) he "also plays an indoor arena anywhere within twenty five
15   (25) miles of the City of Lost Angeles as part of the same tour cycle as the
16   aforementioned O2 Shows," then (c) Live Nation is required "to ensure at least one
17   of those Ozzy Osbourne shows in Los Angeles shall be held at the Staples Center
18   (the 'Staples Center Commitment')"—unless the Los Angeles leg of the tour is
19   promoted by someone other than "a Live Nation Entertainment, Inc. group
20   company."  FAC Ex. 1 at 1.  Notably, AEG is also a major concert promoter in its
21   own right, competing directly with Live Nation to promote the tours of artists like
22   Ozzy.

23       The following month, Sharon Osbourne—Ozzy's wife, who plays a key role
24   in his business operations—responded to the letter AEG had sent to Live Nation,
25   with an email directly to AEG's Chief Operating Officer, Jay Marciano.  She wrote
26   (in relevant part):

27           I am returning the enclosed Staples Center Commitment
              to you, unsigned.
28

1
2
3
4

> Shame on AEG for bringing artists into a power struggle that you're having with your competitor Live Nation. I can assure you that Live Nation would never strong-arm an artist into playing a venue they're not comfortable performing in.

5    FAC ¶ 35.

6        Marciano promptly wrote back. He did not say anything resembling the

7    response one would expect if AEG's position in its Motion were actually *true*—

8    something, perhaps, along the lines of: "Dear Sharon, I am baffled by your note

9    because Ozzy is free to play wherever he wants in Los Angeles. He just needs to

10   use a different promoter." Instead, Marciano wrote that Ozzy had lost his choice

11   because of a dispute AEG was having with The Forum:

12       Dear Sharon,

13       Thank you for your note.

14

15       Please understand this dispute is between The Forum and Staples
16       Center and we couldn't agree with you more—***it should always
         be the artist's choice.*** We long for the days when artists and fans
17       came first.

18       Kindest regards –

19       Jay

20

21       P.S. The other guys started this first!

22   *Id*. ¶ 36 (emphasis added).[1]

23       AEG did not back down—and Ozzy had no choice but to instruct Live Nation

24   to sign the Staples Center Commitment on his behalf, so that he could book the O2

25

26   _____

27   [1] The reference to a "dispute" between the Forum and the Staples Center concerns AEG's contention that the Staples Center Commitment is a response to a similar "block booking" scheme that the Forum engages in with Madison Square Garden in New York. FAC ¶¶ 37-39. What Azoff MSG Entertainment LLC does with respect to the Forum and Madison Square Garden is no defense to AEG's conduct.

28

1   Arena.  *Id.* ¶ 47.  The resulting contract requires Live Nation to direct Ozzy's tour

2   routing in a variety of significant respects, imposing an obligation *on Ozzy* to play

3   or not play shows at various venues subject to the conditions established by the

4   agreement.  *Id.* ¶ 29 ("[O]f course, the artist is the party who actually *discharges* the

5   critical obligation in any agreement between a venue and a promoter or manager, by

6   carrying out the required performance or performances.").

7           The Staples Center Commitment letter also mentions—and is a prerequisite

8   to—"a formal venue-hire agreement."  FAC ¶ 30.  Ozzy referenced but did not plead

9   the detail of AEG's formal venue hire agreements in the FAC, as it did not seem

10  necessary.  But in light of the position AEG is taking in the Motion, the Court should

11  know that AEG's formal venue-hire agreement explicitly requires the promoter to

12  ensure that when the band comes to Los Angeles, *they will play the Staples Center*.

13  The stock language provides that the "Hirer" (meaning the promoter, or in Ozzy's

14  case, Live Nation) "undertakes for the benefit of [AEG]" that "if the headline Artist

15  plays an indoor arena anywhere within the Catchment Area as headline artist as part

16  of the Tour Cycle, at least one of the headline Artist's shows in the Catchment Area

17  shall be held at the Staples Center."  The "Catchment Area" is Los Angeles, and

18  there is no exception to that obligation based on the artist using a different promoter.[2]

19          In short, the obligation AEG seeks to impose means, in practice, what the

20  Complaint alleges: "that artists and musicians cannot play London's most essential

21  large concert venue—the O2 Arena—unless they agree to play the Staples Center

22  during the part of their tours that takes place in Los Angeles."  FAC ¶ 2.

23  _____

24  [2] Under *Davis v. HSBC Bank Nev., N.A.*, 691 F.3d 1152, 1160-61 (9th Cir. 2012), a
    court may in appropriate circumstances consider documents referenced in but not
25  attached to a complaint for the purpose of a motion to dismiss. Furthermore, AEG is
    in no position to complain about the use *of its own contract* to impeach a
26  misrepresentation about the meaning of the Staples Center Commitment letter. In all
    events, Ozzy could certainly replead to add the relevant provisions of the formal hire
27  agreement if absolutely necessary.  The only reason they are not in the FAC is that
    AEG never made clear in the course of the parties' meet-and-confers that it was
28  going to base its motion on the counterfactual suggestion the Staples Center
    Commitment allows precisely what its own venue-hire agreement precludes.

## B.   Procedural History

Ozzy filed this lawsuit on March 21, 2018.  The Complaint sought solely injunctive and declaratory relief on behalf of Ozzy and a class of similarly situated parties, to prevent AEG from harming artists by depriving them of the benefits of competition for their shows in Los Angeles.

Over the course of the ensuing month, the parties met-and-conferred multiple times regarding a handful of dubious motions that AEG was threatening—including both a motion to dismiss and another one to strike the class claims.  In the course of those conversations, it became clear that AEG plainly misunderstood some of the essential factual and legal allegations in the Complaint.  High among them were facts about the relationship between Ozzy and Live Nation.  AEG's counsel maintained that the Staples Center Commitment had no effect on Ozzy at all, by virtue of the fact that he personally did not sign it.  Efforts to explain basic agency concepts failed to avert a motion.  Ozzy therefore chose to file a First Amended Complaint clarifying (one would have thought needlessly) that (a) in fact, an artist's promoter is his business representative, so agreements that a promoter signs bind the artist, and (b) irrespective of who signs the paper booking the venue, the artist personally profits from competition for his services, and personally suffers from a lack thereof.  *See* FAC ¶¶ 28-29.

Surprisingly, AEG responded by threatening essentially the same motions.  The parties again met-and-conferred.  AEG refused to back down.  And here we are.

## III.   ARGUMENT

AEG's primary arguments—about coercion and standing—fail at every turn.  They assume facts contrary to those pled.  And even if they didn't, AEG would still be wrong that its explicit, brazen tying arrangement neither coerces nor injures Ozzy.  AEG's ancillary arguments are equally meritless.  They mischaracterize and ignore large swaths of the FAC, and run headlong into precedent explicitly permitting what AEG claims the law precludes.

**A.     Ozzy Has Antitrust Standing Because The Staples Center Commitment Forecloses Competition To His Detriment**

Under Section 16 of the Clayton Act, 15 U.S.C. § 27, any person threatened with loss or damage by reason of an antitrust violation may seek injunctive relief. That broad grant of standing is tempered, modestly, by the concept of "antitrust injury," but under Ninth Circuit law that simply means injury from what makes the conduct unlawful under the antitrust laws. *Gen. Tel.*, 190 F.3d at 1055.  Ozzy is threatened with a causal antitrust injury because he was forced to agree to the Staples Center Commitment to book the O2, which means he is no longer free to book the Los Angeles venue of his choice.

AEG challenges that claim *factually*—on a motion to dismiss—albeit with a contract interpretation argument it would have the Court adjudicate without the benefit of any discovery.  It argues that "under its plain terms" the Staples Center Commitment "is an agreement between AEG and Live Nation," and:

> Ozzy is not a party to the agreement and ***is not subject to its obligations***.  Thus, the LN/Ozzy Commitment Letter does not deprive Ozzy of any "competitive benefits" whatsoever.  Regardless of whether Live Nation enters the LN/Ozzy Commitment Letter, Ozzy remains free to "play venues off each other to negotiate more favorable deal terms."

*See* MTD at 10:24-11:3 (emphasis added).

Respectfully, AEG knows better than this.

**1.     The Staples Center Commitment Regulates Ozzy's Conduct**

Yes, Ozzy is not a party to the agreement—but that is simply because in the music industry artists make commercial arrangements through representatives. *See* FAC ¶ 28.  In this instance Ozzy's promotor, Live Nation, contacted AEG *on Ozzy's behalf* and made all of the arrangements necessary to secure the O2 for Ozzy's concert.  But the agreement explicitly binds Live Nation to bind Ozzy.  It provides that Live Nation "shall ensure" his compliance.  *See* FAC Ex. 1 at 1.  It further

authorizes injunctive relief to preclude Ozzy from playing at the Forum in violation of the contract that Live Nation and AEG have entered. *Id*. at 2. The notion that Ozzy is "not subject to its obligations" is absurd. *His conduct* is, in a very literal sense, the specific "subject" of the contract. *Cf. Comedy Club, Inc. v. Improv W. Assocs.*, 553 F.3d 1277, 1287 (9th Cir. 2009) (explaining that under California law, "[a] contract may bind non-parties such as an intended third party beneficiary, an agent, or an assignee") (internal citations omitted).[3]

And the restrictions on *Ozzy's conduct* that the Staples Center Commitment imposes plainly harm competition to his detriment. When the contractual obligations kick in, if "Ozzy Osbourne also plays an indoor arena anywhere within twenty five (25) miles of the City of Los Angeles," then he has to play at Staples. *See* FAC Ex. 1 at 1; FAC ¶ 34 (explaining that an obligation to play "at least one" show at Staples is a *de facto* obligation to play all Los Angeles shows at Staples, because of switching costs and other considerations). That "Commitment" (as the title of the document labels it) means that Ozzy is not free to enjoy the fruits of competition for his services among venues in Los Angeles, because he must play AEG's venue. But for the "Commitment," he would be able to "extract favorable deal terms from the Forum by threatening to play Staples instead, and … extract favorable deal terms from Staples by threatening the Forum instead." FAC ¶ 48. To be sure, others like Live Nation would conduct the negotiations necessary to secure those benefits on Ozzy's behalf. Ozzy is a singer, not an expert in negotiations. But the FAC specifically alleges that those favorable deal terms would redound to Ozzy's benefit because he would get a cut of any gains. *Id*. ¶ 29. It is irrelevant whether he personally signs the ultimate venue-hire agreement or his representative does. So it is his conduct—where he plays—and his financial interests that are affected by the "Commitment."

---

[3] The Staples Center Commitment is subject to California law.

### 2.   The Restrictions On Ozzy's Conduct Directly Cause Precisely The Harm That Tying Doctrine Forbids

Turning then to the law, AEG grounds its Motion on the five-factor standing test the Supreme Court has prescribed for *damages actions*.  *See* MTD at 8:11-19. "These factors are: (1) the nature of the plaintiff's alleged injury; that is, whether it was the type the antitrust laws were intended to forestall; (2) the directness of the injury; (3) the speculative measure of the harm; (4) the risk of duplicative recovery; and (5) the complexity of apportioning damages."  *See Amarel v. Connell*, 102 F.3d 1494, 1507 (9th Cir. 1996) (citing *Assoc'd Gen. Contractors of Cal., Inc. v. Cal. State Council of Carpenters*, 459 U.S. 519, 535 (1983)).  Obviously the last two of those factors are explicitly about damages and thus have no bearing here, where Ozzy seeks injunctive relief only.

Of the remaining factors, the most important is antitrust injury, which under *General Telephone Co.*, 190 F.3d at 1055, means there has been: "(1) unlawful conduct, (2) causing an injury to the plaintiff, (3) that flows from that which makes the conduct unlawful, and (4) that is of the type the antitrust laws were intended to prevent."  Here, the unlawful conduct is AEG's tying the right to rent the O2 to an obligation to rent Staples.  As noted earlier, that tying causes (or in this case threatens to cause) *inter alia* the following injury: Ozzy is forced to play Staples if he wants to play Los Angeles, to his financial detriment.  *See* FAC ¶¶ 28, 29, 48.  So the only question is whether that is the type of injury that flows from what makes tying illegal, and which the antitrust laws are intended to prevent.  The answer is yes.

As the Supreme Court has explained, repeatedly:

> Basic to the faith that a free economy promotes the public weal is that goods must stand the cold test of competition; that the public, acting through the market's impersonal judgment, shall allocate the Nation's resources and thus direct the course its economic development will take.  By conditioning his sale of one commodity on the purchase of another, a seller coerces the abdication of the buyer's independent judgment as to the "tied" product's merits and insulates it from the

competitive stresses of the open market.

*Jefferson Parish*, 466 U.S. at 12-13 (quoting *Times-Picayune Publ'g Co. v. United States*, 345 U.S. 594, 605 (1953)) (alteration omitted).   The rules against tying directly reflect these policy concerns:

> There is a general agreement in the cases and among the commentators that the fundamental restraint against which the tying proscription is meant to guard is the use of power over one product to attain power over another, or otherwise distort freedom of trade and competition in the second product. ***This distortion injures the buyers of the second product***, who because of their preference for the seller's brand of the first are artificially forced to make a less than optimal choice in the second.

*Id*. at 13 n. 19 (quotation marks omitted, emphasis added).

The point of this lawsuit is that AEG has market power in London, which it uses "to distort freedom of trade and competition" in Los Angeles.   The Supreme Court has said that distortion amounts to antitrust injury for those affected by it. *See id*. at 15 ("[F]rom the standpoint of the consumer—whose interests the statute was especially intended to serve—the freedom to select the best bargain in the second market is impaired by his need to purchase the tying product[.]").   The Ninth Circuit has made crystal clear that "[c]oercive activity that prevents choice between market alternatives, including agreements to restrain trade, is one form of antitrust injury." *Theme Promotions, Inc. v. News Am. Mktg. FSI*, 546 F.3d 991, 1003 (9th Cir. 2008).   So there is no standing defect in this case.   The injury Ozzy suffers by virtue of the elimination of choice between alternatives in the "tied" product market is harm that flows *precisely* from what makes tying illegal, and what tying doctrine is supposed to remedy.

AEG nevertheless contends that Ozzy lacks antitrust standing because he is not "a participant in the same market" as AEG, which in turn means he "could suffer only indirect injury."   MTD at 12:6-9 (capitalization altered).   That is wrong.   The

"directness" inquiry the Supreme Court prescribed for the antitrust standing analysis is not a formalistic box-checking exercise that asks the yes-or-no question whether the plaintiff "directly" interacted with the defendant. Instead, the test calls for a pragmatic analysis of "the chain of causation between the [plaintiff's] injury and the alleged restraint in the market." *Assoc. Gen. Contractors*, 459 U.S. at 540. Where the chain "contains several somewhat vaguely defined links," that is a problem. *Id.* But where the causation logic is perfectly coherent, it is no problem at all. As the Supreme Court has explained, for example, "if a group of psychiatrists conspired to boycott a bank until that bank stopped making loans to competing psychologists, antitrust standing would exist not only for the bank, the target of the primary boycott, but also for the psychologists, against whom the secondary boycott was directed." *Amarel*, 102 F.3d at 1512 (citing *Blue Shield of Va. v. McCready*, 457 U.S. 465, 484 n.21 (1982)).

To be sure, in a very different antitrust context, it matters a great deal whether the plaintiff was the one who "directly" interacted with the defendant. Specifically, for consumers seeking relief on the theory that they were overcharged by virtue of an upstream antitrust offense, *damages* are available only to "direct purchasers"—*i.e.*, people who bought the product straight from the defendant. "Indirect purchasers"—*i.e.*, people who bought a product from the person who bought the product from the defendant—generally cannot seek monetary relief, for a variety of reasons that the Supreme Court articulated in *Illinois Brick v. Illinois*, 431 U.S. 720 (1977). But the *Illinois Brick* rule does nothing to limit who can seek *injunctive* relief. And as courts have long recognized, so long as an indirect purchaser is "threatened" with antitrust injury, 15 U.S.C. § 27, he is free to assert such claims. *See, e.g.*, *Lucas Auto. Eng'g*, 140 F.3d at 1235. Indirect purchasers have, accordingly, frequently established antitrust standing to seek equitable remedies, including in circumstances starkly similar to those presented here. *See, e.g., Sidibe*,

1    2013 WL 2422752, at *13 (rejecting argument that plaintiffs lack standing to assert

2    a tying claim because they "are not parties to the contract" establishing the tie).

3        Ozzy plainly has standing because (a) he is threatened with antitrust injury

4    that flows in no more than one or two direct steps from AEG's unlawful conduct,

5    and (b) even if it is correct to think of him as an "indirect purchaser" of venue rental

6    services from AEG (procured through his representative Live Nation), that status is

7    no bar to this suit.[4]  It all comes back to the fact that the Staples Center Commitment

8    precludes Ozzy from enjoying the benefits of competition in Los Angeles that the

9    antitrust laws entitle him to enjoy.  It is an operative contract that limits *what he can*

10   *do*.  It does so in precisely "the market where competition is being restrained."  *Cf.*

11   MTD at 12:12-14.  That others negotiate for him and execute contracts on his behalf

12   makes no difference to the standing inquiry, which focuses instead on the alleged

13   *effects* of the Defendant's conduct.  *See Gen. Tel. Co.*, 190 F.3d at 1057 (explaining

14   that courts "routinely recognize the antitrust claims of market participants other than

15   consumers or competitors").

16                    *        *        *

17       AEG's arguments about antitrust injury and the "directness" of harm caused

18   by the tying arrangement challenged here are meritless.  Ozzy has standing.

19   **B.    The Staples Center Commitment Is Plainly Coercive**

20       AEG next argues that Ozzy has failed to state a tying claim because he has

21   not alleged the requisite coercion, or forcing.  MTD at 13:19-16:13. That is plainly

22   wrong as well, as the FAC alleges explicit and unavoidable contractual tying.

23

24

25   [4] The alternative would be to conceive of Ozzy as the principal acting through an
     agent—in which case, under the case law, he himself would be considered the "direct
26   purchaser."  *See In re Cathode Ray Tube (CRT) Antitrust Litig.*, 2016 WL 7805628,
     at *14 (N.D. Cal. Aug. 4, 2016) ("[W]here a purchasing agent purchases goods on
27   behalf of its principal, the principal—not the purchasing agent—is the direct
     purchaser, unless the agent represents a distinct economic entity in the good's chain
28   of distribution.").

### 1.   Ozzy Has Alleged Coercive Tying By Express Contract, And It Makes No Difference Whose Signature Is On The Contract

To state a tying claim,

> a plaintiff must prove: (1) that the defendant tied together the sale of two distinct products or services; (2) that the defendant possesses enough economic power in the tying product market to coerce its customers into purchasing the tied product; and (3) that the tying arrangement affects a not insubstantial volume of commerce in the tied product market.

*Cascade Health Sols.*, 515 F.3d at 913 (internal citation omitted).[5]  "Coercion" is relevant to the first two elements in various ways, but AEG's Motion is about the first element, which is the threshold question of whether there really is tying.  In this setting, "a coercion test serves to distinguish transactions in which the purchaser voluntarily acquires bundled goods or services from transactions in which the seller compels the purchase of bundled products against the buyer's will."  ABA Section of Antitrust Law, ANTITRUST LAW DEVELOPMENTS 184 (8th ed. 2017).  In other words, true tying must involve "conditioning," "forcing" or "coercion"—all of which are essentially synonymous for these purposes—because if the buyers are free to take the tying and tied products separately but just *prefer* to buy bundles, there is no tying.  *Id.*

Ozzy alleges that he did *not* want to accept the Staples Center Commitment and was forced to accept it anyway.   After Live Nation forwarded AEG's Commitment letter, Sharon Osbourne tried to return it to AEG unsigned, FAC ¶ 35; AEG stood firm, *id.* ¶ 36; so against Ozzy's first preference, and because he had no choice, Ms. Osbourne instructed Live Nation to sign the letter to get the O2 date, *id.* ¶ 47.  That is a straightforward allegation of coercion that AEG's motion simply ignores.  It is, moreover, an allegation of express contractual conditioning, which

---

[5] As discussed below, this is the test for a *per se* tying claim.  "Rule of reason" tying claims are subject to a slightly different one—though both require showing coercion.

LATHAM&WATKINS LLP
ATTORNEYS AT LAW
SAN FRANCISCO

*always* suffices to plead coercion.  *See, e.g., Mozart Co. v. Mercedes-Benz of N. Am., Inc.*, 593 F. Supp. 1506, 1517 (N.D. Cal. 1984) (contractual tying language sufficient to establish coercion), *aff'd*, 833 F.2d 1342 (9th Cir. 1987); *Tic-X-Press*, 815 F.2d at 1416; *see also Paladin Assocs., Inc. v. Montana Power Co.*, 328 F.3d 1145, 1160 (9th Cir. 2003) (explaining that "[t]he Supreme Court has found evidence of coercion when a plaintiff produced a written contract that required purchase of the tied product") (citing *N. Pac. Ry. Co. v. United States,* 356 U.S. 1, 7 (1958)).

AEG nevertheless argues that "the fact that Ozzy never signed the LN/Ozzy Commitment Letter"—meaning that he did not sign it *personally*—"precludes any claim that he has been 'required to agree' to its terms and coerced into performing at Staples as a condition of performing at the O2."  MTD at 14:20-22.  This appears to be a repackaging of the same arguments AEG advances in support of its contention that Ozzy suffered no antitrust injury.  But again, this is just quibbling with the details of *who* was coerced.  Ozzy has unquestionably alleged coercion through the express conditioning in the Staples Center Commitment.

Antitrust law does not require the antitrust plaintiff to plead or prove that it was *personally* coerced by the defendant.  To state the substantive offense of tying, the plaintiff must allege that *the buyer of the tying product* was forced to take the tied product, whether or not the buyer is the plaintiff.  This is evident in the many "third party" tying suits—where, for example, the plaintiff is a *competitor* in the tied product market, rather than the customer who was forced to buy the tied product. *See, e.g., Cascade Health Sols.*, 515 F.3d at 913 (discussing whether to lessen the "coercion" requirement in "third-party suits").  Consumer claims based on the effects of tying on upstream parties are also common.  *See, e.g., In re Qualcomm Antitrust Litig.*, 292 F. Supp. 3d 948, 966-972 (N.D. Cal. 2017) (consumer plaintiffs "plausibly alleged antitrust injury in the form of supra-competitive prices for handsets" because defendant's anticompetitive conduct, including an upstream tying arrangement, generated a "surcharge" that was "passed down through a distribution

chain"). It is therefore immaterial whether one views this case as conditioning and coercion against Live Nation as the buyer or Ozzy as the buyer. Either way, AEG is coercing *a buyer* of the O2 arena to accept Staples for any Los Angeles leg of the tour, which is a *per se* violation of the Sherman Act. *See Cascade Health Sols.*, 515 F.3d at 913; *Jefferson Parish*, 466 U.S. at 15-16.

### 2. AEG's Contention That Ozzy Is Free To Play Other Los Angeles Venues So Long As He Uses Another Promoter Does Not Negate Coercion

A different variant of AEG's "coercion" argument is that the FAC fails to state a claim because, under AEG's interpretation of the Staples Center Commitment, Ozzy is free to play the Forum when he comes to Los Angeles so long as Live Nation does not promote the show. *See* MTD at 16:6-8; *see also id*. at 2:3-5 ("The LN/Ozzy Commitment Letter might prevent **Live Nation** from promoting Ozzy's Los Angeles show. But nothing in the LN/Ozzy Commitment Letter prevents **Ozzy** from playing at the Forum.").

First, as we have already discussed, AEG is simply contesting the FAC's allegation that "AEG requires that artists and musicians cannot play London's most essential large concert venue—the O2 Arena—unless they agree to play the Staples Center." FAC ¶ 2; *see also* FAC ¶ 45 ("playing the Forum compromises the artist's ability to play the O2"); ¶ 47 (describing "the flagrantly unlawful contractual term [the AEG Defendants] regularly impose on artists, forcing them to take dates at Staples that they either do not want, or would agree to only after fully enjoying the fruits of unrestrained competition among venues"); ¶ 58 ("The Staples Center Commitment prevents promoters or other artist representatives from negotiating better terms at the available venues in greater Los Angeles and locks artists into performing at one venue when they would prefer to perform at another[.]"). That is obviously not appropriate on a motion to dismiss. Even in the post-*Twombly* era, factual allegations of this type are assumed be true so long as they "plausibly suggest an entitlement to relief, such that it is not unfair to require the opposing party to be

1   subjected to the expense of discovery and continued litigation." *Starr v. Baca*, 652

2   F.3d 1202, 1216 (9th Cir. 2011).

3       Ozzy's position is far more than plausible; it is unassailable.   Until this

4   Motion, AEG has never denied that the Staples Center Commitment requires artists

5   to play Staples.  For example, Mr. Marciano's response to Sharon Osbourne's email

6   betrays not a hint of a suggestion that Ozzy is perfectly free to play the Forum if he

7   just stops using Live Nation.   To the contrary, it casts the Staples Center

8   Commitment as an in-kind response to an alleged block-booking arrangement—by

9   a competing *venue owner*—that ties Madison Square Garden and the Forum. *See*

10  FAC ¶ 37; MTD Opp. at 5:11-16.  "The other guys started this first!" he writes.  FAC

11  ¶ 36.  This litigation probably would not exist had Mr. Marciano disavowed the

12  Staples Center Commitment and said, as the Motion does, that AEG's policy "does

13  not 'coerce' or 'force' [Ozzy] to do anything."  MTD at 2:27.  But he did not.  He

14  defended the tying arrangement, albeit with the weak apology that he "long[ed] for

15  the days when artists and fans came first."  FAC ¶ 36.  And if there is any doubt, the

16  formal venue-hire agreement that AEG imposes—and which Ozzy can plead in

17  detail if necessary—states that "if the headline Artist plays an indoor arena anywhere

18  within the Catchment Area [Los Angeles] as headline artist as part of the Tour Cycle,

19  at least one of the headline Artist's shows in the Catchment Area shall be held at the

20  Staples Center."  It has no "exception" that would allow "Artist" *not* to conduct

21  shows in Los Angeles if "Artist" switches promoters.

22      "[W]hether there is a tie turns on whether the defendant gave buyers the

23  reasonable impression that it would not sell product A to those who would not buy

24  its B."  *Aerotec Int'l, Inc. v. Honeywell Int'l, Inc.*, 836 F.3d 1171, 1178 (9th Cir.

25  2016) (quoting 10 Areeda & Hovenkamp ¶ 1752d (3d ed. 2011)).   Explicit

26  contractual conditions like this are coercion *per se*.  *See Mozart Co.*, 593 F. Supp. at

27  1517; *Paladin*, 328 F.3d at 1160.  There is no basis for the Court to conclude, on a

28

1  motion to dismiss and given an explicit tying condition in writing, that AEG did not

2  give buyers precisely that impression.

3        **3.    The MTD Would Fail Even If AEG Were Only Requiring**
          **Ozzy to Abandon His Chosen Promoter**
4

5        Finally, even assuming *arguendo* that Ozzy actually would be allowed to

6  enjoy the fruits of competition between Los Angeles venues if he just kicked Live

7  Nation to the curb, AEG's argument would still fail.  That is because AEG's position

8  amounts to the defense that it is not engaging in the illegal tie alleged, *because it is*

9  *engaging in a different illegal tie instead*—what antitrust law calls a "negative tie"

10  between, in this case, renting the O2 Arena and using the promoter of one's choice.

11        "Prohibited tying arrangements … include both positive and negative ties."

12  *Aerotec*, 836 F.3d at 1178.  "A negative tie occurs when the customer promises not

13  to take the tied product from the defendant's competitor."  *Id.* (alterations and

14  quotation marks omitted).  AEG, a major concert promoter and competitor to Live

15  Nation, affirmatively argues that as a condition of playing the O2, Ozzy has to agree

16  not to use Live Nation to promote his shows in Los Angeles if he wants to choose

17  among venues.  That is the very definition of a negative tie—between venue rentals

18  in London (the tying product) and concert promotion services in Los Angeles (the

19  tied product).

20        Either way, though, the fact of the matter is that Ozzy is coerced.  Under

21  AEG's revisionist understanding of the Staples Center Commitment, it forces Ozzy

22  to select between using his preferred concert promoter and foregoing the right to

23  extract concessions from dueling venues in Los Angeles.  Just because Ozzy has to

24  pick his poison does not mean that he is free from coercion.  To the contrary, being

25  told, "You must take the tied product—or suffer substantial harm of one type or

26  another" is, plainly, the kind of anticompetitive forcing that tying doctrine

27  proscribes.  *Cf. Datagate, Inc. v. Hewlett-Packard Co.*, 60 F.3d 1421, 1426 (9th Cir.

28  1995) (finding evidence of coercion where defendant allegedly told customers that

they would not be allowed the tying product if they took the tied product from defendant's competitor).  So even if the Court actually accepted AEG's factual contentions that contravene the allegations in the FAC, AEG would still lose. [6]

## C.    AEG's Ancillary Arguments Fail

In fewer than three pages tacked onto the end of its Motion, AEG launches two additional attacks: first, the suggestion that there is some legal defect that requires dismissal in the FAC's definition of the market for the "tying" product; and second, the claim that the FAC fails "to adequately plead anticompetitive effects" in the "tied" product market.  Both arguments are incorrect.

### 1.    There Is No Market Definition Defect

Both sides here agree that a tying claim requires the assertion of a valid "product market" for both the tying product and the tied product.  *See* MTD at 16:20-21; *Jefferson Parish*, 466 U.S. at 21.  And both sides more or less agree on the legal rules that determine how to properly define a market: one looks to "the pool of goods or services that enjoy reasonable interchangeability of use and cross-elasticity of demand," *see* MTD at 16:25-27 (quoting *Tanaka*); and one looks to the relevant geography in which buyers can effectively "turn for alternative sources of supply," *see* MTD at 17:1-2 (same).

AEG nevertheless asserts that the FAC has "arbitrarily limited" the tying product market "to a particular seller or particular brand."  MTD at 17:15-16.  That is false.  Ozzy is not alleging what one sometimes sees in antitrust litigation by way

---

[6] AEG argues that something about the *It's My Party* case excuses its conduct here. *See* MTD at 15:14-16:12 (discussing *It's My Party v. Live Nation, Inc.*, 811 F.3d 676 (4th Cir. 2016)).  That is incorrect.  While that case is largely about different issues altogether, the passage of the opinion that AEG has seized on concerns the court's conclusion that "[i]n no instance … did LN [the defendant concert promoter] convey that an artist could not receive its promotion services unless it appeared at Nissan" Pavilion, a venue in Virginia.  *See It's My Party*, 811 F.3d at 685.  The court thus rejected the contention, as a factual matter, that the plaintiff could satisfy the "coercion" element of a tying claim, because the record showed that "LN simply outcompeted IMP and gave artists better compensation to appear at LN venues." *Id.* at 686.  That hardly means that what AEG is doing *here* is not coercive.  This is the rare case of explicit contractual tying, and by a monopolist no less.

of a "single-brand market," *i.e.*, a market gerrymandered to artificially include just the one product sold by the defendant—even though that product competes with others.   *See, e.g., Apple, Inc. v. Psystar Corp.*, 586 F. Supp. 2d 1190, 1198 (N.D. Cal. 2008) (rejecting an Apple-only operating system market); *Right Field Rooftops, LLC v. Chicago Baseball Holdings, LLC*, 87 F. Supp. 3d 874, 887 (N.D. Ill. 2015) (rejecting product market defined to include only Chicago Cubs games; "[w]hile the Court accepts that there are some die-hard Cubs fans that would never attend a White Sox game, that does not mean that Cubs games constitute their own market").

To the contrary, the two markets at issue in this case are explicitly defined to encompass the complete set of venues, with the requisite attributes, that are reasonably interchangeable for the buyers at issue in London and Los Angeles, respectively.  *See* FAC ¶¶ 41-45.[7]  That means all of the reasonably interchangeable venues, with no "single-brand" limitation whatsoever.  For major rock acts like Ozzy, it is well-accepted in the industry that "arena-sized venues" compete primarily with other arena-sized venues, and therefore the FAC alleges markets for "arena-sized venues for musical concerts in (a) London or greater London, and (b) Los Angeles or greater Los Angeles."  FAC ¶ 52.  This is routine, standard stuff.

It so happens that in London, applying those criteria to the world as it exists, there is only one venue that can effectively host major arena concerts—the O2.  *Id*. ¶¶ 42-43.  In Los Angeles, there are at least two.  *Id*. ¶ 45.  But to be clear, that there is only one such venue in the London market is not a function of any particular affinity for or allegiance to the AEG or O2 brands; it is because there are no reasonably interchangeable alternatives to the O2 that are actually available for artists looking for arena-sized indoor venues in London.  *Id*. ¶¶ 41-43.

---

[7] The suggestion that the FAC "equivocates" with respect to the alleged market definition—on the basis that it explains that the O2 is a singular arena not just in London but the world over—is baseless. *Cf.* MTD at 17 n.7.  No, that does not mean the tying product market is all venues everywhere.  It means that the O2 is a leading venue not just in its geographic market, but on a much larger, global scale as well.

As a matter of law, that approach and result are perfectly acceptable.  The law of market definition imposes no minimum number of firms that must meet the criteria for a well-defined market.  *See Tic-X-Press*, 815 F.2d at 1420 (rejecting challenge to tying product market defined as indoor arena-sized venues in Atlanta, which yielded precisely one facility of the requisite type).  AEG is a monopolist in London not by virtue of any legal trickery, but rather because it in fact owns the sole product that satisfies the operative (and perfectly standard) demand criteria.

### 2. Per Se Tying Violations Do Not Require Anticompetitive Effects In The Tied Product Market, But the FAC Alleges Them Comprehensively In Any Event

AEG also makes the utterly frivolous argument that Ozzy has not pled adverse competitive effects in the tied product market (Los Angeles).  It is frivolous first because that is not an element of a *per se* tying claim, as exists here, and second because Ozzy did in fact plead adverse effects.

As the Court knows, some conduct violates the Sherman Act only when the facts and circumstances show that competition has actually been harmed by what the defendant did, under the legal framework known as the "rule of reason"; and some conduct is *per se* illegal irrespective of its effect on a market in a given instance.  *See generally Leegin Creative Leather Prods., Inc. v. PSKS, Inc.*, 551 U.S. 877, 886-87 (2007).  Tying is somewhat unique, in that it may be either.  The FAC alleges both varieties: that AEG has engaged in (a) *per se* unlawful tying, *see id.* ¶ 52, and (b) tying that is unlawful under the rule of reason, *see id*. ¶ 54.

In the Ninth Circuit, adverse competitive effects in the tied market are not an element of a *per se* tying claim.  Rather:

> For a tying claim to suffer per se condemnation, a plaintiff must prove: (1) that the defendant tied together the sale of two distinct products or services; (2) that the defendant possesses enough economic power in the tying product market to coerce its customers into purchasing the tied product; and (3) that the tying arrangement affects a not insubstantial volume of commerce in the tied product market.

1    *Cascade Health Sols.*, 515 F.3d at 913 (quotation marks omitted).

2         The rule of reason tying analysis, which is usually applied to claims of "soft"

3    tying without the kind of explicit forcing at issue here, *Jefferson Parish*, 466 U.S. at

4    15, requires more. "[A] plaintiff bringing a rule of reason tying case" must also

5    allege "an actual adverse effect on competition caused by the tying arrangement."

6    *Brantley*, 675 F.3d at 1200 (internal citations omitted). The difference, then, is that

7    to make out a *per se* claim, the only showing the plaintiff has to make with respect

8    to the tied product market is that "the tying arrangement affects a not insubstantial

9    volume of commerce"—while a rule of reason claim requires allegations of how the

10   tying had "an actual adverse effect on competition."

11        For Ozzy's *per se* tying claim, the attack in AEG's motion is thus entirely off

12   the mark: anticompetitive effects in the tied product market are not an element of the

13   claim.[8] So there would certainly be no ground for the Court to dismiss if it were true

14   that the FAC failed to alleged such effects.

15        But in reality the FAC alleges substantial anticompetitive effects in the tied

16   product market. The primary one is that the Staples Center Commitment distorts

17   competition for artists' patronage among venues in Los Angeles. FAC ¶¶ 46-48.

18   This tracks closely the Ninth Circuit's statement in *Brantley* that one anticompetitive

19   effect of tying is "that the tying arrangement . . . causes consumers to forego the

20   purchase of substitutes for the tied product." 675 F.3d at 1201. It also "creates a

21   barrier to entry for any other venue (or potential, developing venues) that may wish

22   to compete for large concerts or other performances in Los Angeles." *Compare* FAC

23   ¶ 59 *with F.T.C. v. Procter & Gamble Co.*, 386 U.S. 568, 578 (1967)

24   ("anticompetitive effects" include conduct that "may substantially reduce the

25

26   _____

27   [8] AEG seems to have missed this point despite that it is recited explicitly in paragraph
     53 of the FAC itself: "Because of the … explicit nature of the tying arrangement,
     the Staples Center Commitment is *per se* unlawful (as that term is used in connection
28   with tying). It is therefore unnecessary for Plaintiffs to plead (or prove) injury to
     competition in the tied product market." FAC ¶ 53.

competitive structure of the industry by raising entry barriers"). These allegations of anticompetitive effects are more than sufficient to satisfy the pleading requirements of Rule 8. To the extent AEG thinks the effects are too little in some way, qualitatively or quantitatively, that's for consideration at a later stage of the case, not on a 12(b)(6) motion.

**IV. CONCLUSION**

AEG should never have brought this meritless motion. For the foregoing reasons, Ozzy respectfully asks the Court to deny it.

Dated:  June 29, 2018

LATHAM & WATKINS LLP

By      /s/ *Daniel M Wall*_____
        Daniel M. Wall
        Timothy L. O'Mara
        Andrew M. Gass
        Kirsten M. Ferguson

        Attorneys for Plaintiff
        Ozzy Osbourne